Emily Budek, Defendant in Error, v. City of Chicago, Plaintiff in Error.

Gen. No. 37,323.

412

414

Opinion filed March 29, 1935.

WILLIAM H. SEXTON, Corporation Counsel, and A. M. SMIETANKA, City Attorney, for plaintiff in error; QUIN O'BRIEN, JAMES J. DANAHER and ADAM E. PATTERSON, Assistant Corporation Counsel, of counsel.

JOSEPH D. RYAN and LOUIS P. MILLER, both of Chicago, for defendant in error.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This writ of error seeks the reversal of a judgment for $50,000 entered in favor of plaintiff, Emily Budek, upon the verdict of a jury in an action of trespass on the case for damages for personal injuries received by plaintiff while riding as a guest in an automobile, caused, as she claims, by the negligence of the city in permitting a portion of the roadway to be broken, rough, depressed and uneven.

The accident happened Sunday evening, February 15, 1931, at about 7:45 p. m. Plaintiff was riding as a passenger in an automobile being driven south on Western avenue between 76th and 77th streets. She was sitting on the lap of her husband, who occupied the rear seat on the right-hand side; next to Mr. Budek sat Mrs. Ahrens, with her husband on the extreme left; the car was being driven by Mr. Swiss, whose wife sat to his right on the front seat beside him. The automobile was traveling between 30 and 35 miles an hour, and the street was rather poorly lighted. 76th street does not run through to the west beyond Western avenue. Sometime prior to the date of the accident defendant had commenced tearing up a portion of the street pavement on Western avenue for the purpose of repairing it; starting at about 80th street and moving north the pavement had been repaired to a point at about 77th street; there are double street car tracks in the center of Western avenue; when defendant's employees quit work for the day on Saturday, February 14, 1931, the day before the accident, they had completed excavating a strip of pavement extending about 303 feet north from 77th street and just west of the west rail of the southbound tracks. The torn-up strip was from five to six feet wide except for a short distance at its north end where it was about 10 feet wide; the street was paved with asphalt, which in the

excavated strip had been cut into pieces of varying size but averaging about one half by two feet; these pieces had been removed and then thrown back loosely and promiscuously into the space where the cut was made before the workmen left the job on Saturday; between the portion of the roadway under repair and the west curb there was room for cars to drive southward.

On the night before this accident several automobiles were damaged by running into this torn-up strip. As the automobile in question approached the excavation from the north, a street car was coming from the south. When the automobile was driven into the excavation the driver lost control and it "jumped" or "bounced" for a distance over the rough and uneven broken pieces of asphalt, and then plunged southeast across the southbound tracks onto the northbound tracks, smashing head-on into the approaching street car and inflicting the injuries of which plaintiff complains.

It is well established that a city must use reasonable care to keep its streets in a reasonably safe condition for the use of the traveling public. (*Purcell v. City of Chicago,* 231 Ill. 164.) The real point in controversy is whether this excavation in the street was protected by lights and barricades so that the traveling public could discover the danger in time to avoid it. The motorman of the northbound street car says that he saw the automobile approaching the torn-up part and that there were no lights or barricades at this point. Another witness, who was in an automobile about 200 feet behind the one involved in the accident, testified as to the absence of any barricades or lights. Three other eyewitnesses to the accident testified either that there were no lights nor barricades or that they saw none at the time of the occurrence. Defendant produced no eyewitnesses to the accident.

The watchman, whose duty it was to safeguard the excavation and put up the barricades and lights, testified that, "it got dark about a quarter to six"; that he then put up six barricades at points in and around the torn-up portion of the street and hung one lighted lantern on the north side, one on the south side and one on the west side of the excavation; that he then went back to the shanty at the construction camp at 80th street; that about 6:30 p. m. a man came there and said that there were no red lights up and that people were running into the torn-up part of the street; that he returned to the excavation at 6:45 p. m. and found neither barricades nor lights at or near it; that he discovered the barricades on the lawn west of Western avenue; that, after returning to the shanty to get more lanterns, he again put up six barricades and three lanterns in the same positions as previously; that when he next went back to the excavation at 7:45 or 8 p. m. he saw the "fire department" and the "police department" at the scene of the accident; that at that time there were neither lights nor barricades to the north of the cut strip or at any other point near it; that he found the lanterns and barricades in the prairie west of Western avenue; and that after the accident he put up six barricades and five lanterns and again went back to the shanty at 80th street.

A number of witnesses testified that there were not only no barricades or lights at this place at the time of the accident, but that there was none on the preceding evening. There was an abundance of evidence from which the jury could properly conclude that there were no barricades or lights at this point either on the night of the accident or on the evening before, even the evidence of the city's watchman being conclusive that there were neither lights nor barricades at or near the dangerous part of the roadway at the time of the accident. The court very properly sub-

mitted this question to the jury. (*Ahrens v. City of Chicago*, 277 Ill. App. 619 [Abst.].)

It is urged that plaintiff failed to affirmatively show that she was in the exercise of reasonable care for her own safety at and immediately prior to the time of the accident. She testified that she had no recollection as to what occurred from the time she entered the automobile until she regained consciousness in the hospital sometime after the accident. Her failure to remember the accident and the occurrences preceding it was explained by the undisputed medical testimony as a lapse of memory such as frequently results from injuries of the character sustained by her. Ahrens, the only other occupant of the automobile who survived the accident, and who sat on the left side of the rear seat, testified that the automobile was "straddling" the west rail of the southbound tracks; that he was looking through the front window over the driver's shoulder, and that he could see quite a distance ahead; that there were no lights or barricades; and that the automobile, "hit the side of the pavement that was torn up, why, it gave two leaps in the air, and then it swerved towards the east and that is all I remember."

There is not a scintilla of evidence that the driver of the automobile was driving recklessly or at an excessive rate of speed. Nor is there a scintilla of evidence that the driver of the automobile or any of its occupants was drunk or crazy or had even a single drink of intoxicating liquor, notwithstanding that it was argued to the jury by defendant's counsel that one and all of them were or must have been drunk or crazy, and, notwithstanding that the same argument is persisted in on this appeal.

The rule is well established that plaintiff was required to use care proportionate to the danger of which the facts conveyed knowledge to her. (*Flynn v. Chicago City Ry. Co.*, 250 Ill. 460.) What facts

were there as the automobile was driven along at a normal rate of speed, under the conditions then prevailing on that thoroughfare, to convey knowledge to her of any lurking danger ahead? The street was open for traffic and she had a right to assume that it was in a reasonably safe condition for ordinary travel thereon by persons exercising ordinary care for their own safety.

While, under the facts of particular cases, it has been held that a passenger in an automobile is bound to take positive action by warning the driver in time to avert a known danger, in the very nature of things it cannot be held as an unvariable rule that every passenger in an automobile who fails to warn the driver of danger in time to avoid it is guilty of contributory negligence. To hold that a passenger riding in the back seat of an automobile is bound to maintain a constant lookout for unknown dangerous conditions in the roadway ahead would be to establish a manifestly unreasonable and impractical rule. (*Graham v. City of Chicago,* 346 Ill. 638; *City of Chicago v. Babcock,* 143 Ill. 358.)

There is no evidence that plaintiff was not in the exercise of ordinary care for her safety. She was sitting on the lap of her husband on the right rear seat, and it was reasonable to believe that she could not see the condition of the street until the automobile had entered upon the excavation strip. Something is said concerning the crowded condition of the back seat, but we cannot see that this would have any bearing upon the accident or plaintiff's exercise of care. (*Ahrens v. City of Chicago, supra.*) The fact that neither Ahrens nor plaintiff testified as to her conduct at and immediately prior to the time of the accident did not raise any presumption of lack of due care on her part. Whether or not she was in the exercise of such care as the law required was necessarily to be determined

from the peculiar facts and circumstances of the case. We think that all the facts and circumstances, including the physical facts of this case and the inferences that might reasonably be drawn from the evidence, constituted a sufficient affirmative showing that plaintiff was free from contributory negligence to properly require the submission of that question to the jury.

Defendant complains of the conduct of plaintiff's attorney upon the trial of the case. It was developed by him that four of the occupants of the automobile were killed in this accident. It was argued that this fact was immaterial and the statement made for the purpose of inflaming the minds of the jurors. We do not agree with this. Plaintiff's counsel felt obliged to account for the failure to produce the occupants of the automobile as witnesses. The explanation that they had been killed was natural and proper. Furthermore the death of other occupants of the automobile was an incident of the accident under consideration. We are of the opinion that all the facts occurring at the time were proper to present in evidence. In many cases similar evidence has been held admissible as tending to show facts growing out of or surrounding the accident. (*West Chicago Street R. Co. v. Kennelly,* 170 Ill. 508; *Beggs v. Iowa Cent. Ry. Co.,* 187 Ill. App. 621; *Ahrens v. City of Chicago, supra.*)

It is claimed that the court erred in admitting evidence of the Caesarean operation upon plaintiff while she was in the hospital as a result of her injuries. Plaintiff was four months pregnant at the time of the accident, and her attending physician testified that when the time arrived for the birth of her baby her condition precluded a natural birth. The necessity for the Caesarean operation was directly attributable to injuries she received in the accident, and it is clear that such operation was a proper element to be considered by the jury in awarding plaintiff damages.

Plaintiff was asked a question about the condition of her child, which she answered before objection was made by defendant's counsel. She volunteered another answer before the court sustained the objection. Counsel made no motion to strike her answers. Inasmuch as the objection was sustained to this line of testimony and the jury was properly instructed as to the elements of damage that might be considered, we think the defendant was not thereby prejudiced.

It is urged that it was improper to admit evidence of prior accidents occurring at the same place and under the same circumstances. It is sufficient to state that such proof was admissible for the purpose of showing that the unsafe thing or condition causing the particular accident was the condition or cause common to such independent accidents, and that the frequency of such accidents tended to show knowledge of such condition. (*Moore v. Bloomington, D. & C. R. Co.,* 295 Ill. 63.) If other persons had met with similar accidents at the same place and for a like cause, it would tend to show knowledge on the part of the city that there was inattention on the part of its agent or agents charged with the duty of warning persons using the street of the danger, and that it had failed to provide adequate means for the protection of persons approaching the excavation. (*City of Chicago v. Powers,* 42 Ill. 169.)

Defendant strenuously insists that plaintiff's counsel's argument to the jury was improper and highly prejudicial in that he sought to inflame the minds and arouse the passions of the jurors against defendant. We find no merit in this contention. After careful examination of the complete arguments of opposing counsel, we think that, considering the argument of defendant's counsel, plaintiff's attorney's closing argument was essentially proper. Not a single objection was voiced during the course of such argu-

ment to the language which is criticized here. Defendant's failure to object in the trial court to the purported objectionable features of the argument precludes it from raising the question now. While it is the duty of the trial court, without waiting for an objection from opposing counsel, to control counsel in argument before a jury, still, if counsel desires to take advantage in a court of review of improper remarks of opposing counsel made to the jury in argument, he must first give the trial court an opportunity to remove the evil effect of the remarks, if any, from the minds of the jurors by making specific objections at the time they are made, and if no specific objection be made the objection will not be considered in this court. (*Illinois Cent. R. Co. v. Cole,* 165 Ill. 334; *Peterson v. Pusey,* 237 Ill. 204; *Waschow v. Kelly Coal Co.,* 245 Ill. 516.)

Defendant contends that the giving of plaintiff's instruction No. 1 was erroneous. This instruction contained a correct statement of the law applicable to plaintiff's theory of the case under the evidence and the issues presented, and we do not think that the jury could possibly have been misled by it. In several instructions, stating its theory of the case, defendant used the same language now criticized and recognized its duty as set forth in this and its own instructions, and it cannot now be heard to question the correctness of this instruction.

Defendant complains of instruction No. 6, given at plaintiff's request, which is as follows:

"If from a preponderance of the evidence, under the instructions of the court, the jury find the defendant guilty of negligence as charged in the plaintiff's declaration, and that as a direct and proximate result thereof the plaintiff sustained injury as charged in said declaration, and if you further believe from a preponderance of all the evidence in the case that the

plaintiff was at all times in the exercise of ordinary care for her own safety, then, even though it should appear from the evidence that the driver of the automobile in which the plaintiff was riding was also negligent in the management or operation of said automobile and that the negligence of the driver of said car—if you find from the evidence that he was negligent—contributed toward bringing about the accident and injury, if any, to the plaintiff, nevertheless, if the jury also find from a preponderance of the evidence that the plaintiff was riding as a passenger in said automobile and that she had nothing to do with its management or control, then any negligence of said driver—even if you should find he was negligent on the occasion in question—cannot be imputed to the plaintiff so as to make her responsible for or chargeable with the negligence, if any, of such driver.''

At defendant's request the court gave the following instruction:

''The court instructs the jury that while it is a general rule of law that where a person is riding merely as a passenger in a vehicle which is being driven by another and where such passenger has nothing to do with its management or control, that then the negligence of the driver of such a vehicle cannot be imputed to such mere passenger, . . .''

It will be noted that defendant in this instruction recognized the rule of law presented to the jury in plaintiff's criticized instruction. However, it is insisted that a similar instruction was condemned in the case of *Opp v. Pryor,* 294 Ill. 538. In that case the plaintiff was riding in the right-hand front seat of an automobile approaching a railroad crossing which was well lighted, and a train was backing over the crossing from plaintiff's right, so that she was nearer to it than the driver of the car. On this train were several members of the train crew with lighted lanterns, which

were observed by other witnesses at a distance considerably farther from the crossing than plaintiff. In the *Opp* case the court said at pages 547, 548:

"It was essential for the plaintiff to prove that she was in the exercise of ordinary care for her own safety in approaching and going upon the crossing, and she was not relieved from that duty because she was riding in an automobile. If she exercised such care any negligence of Ethel Shambaugh could not be imputed to her, but she would be responsible for her own negligence. The plaintiff sat at the right of the driver in front, with at least equal opportunity to observe danger and the approach of the train, and being bound to prove the exercise of ordinary care by herself, it was no less her duty than that of the driver to observe and avoid danger, if practicable, and to warn the driver. (*Flynn v. Chicago City Ry. Co.*, 250 Ill. 460; *Pienta v. Chicago City Ry. Co.*, 284 id. 246.) . . . If Ethel Shambaugh was not guilty of any negligence in driving the car and could not see or hear anything to indicate the approach of the train, it would, perhaps, be a fair inference that the plaintiff could not, but the instruction was inconsistent and contradictory in substantially telling the jury that although Ethel Shambaugh did not exercise ordinary care for the safety of those in the automobile yet the plaintiff might have been in the exercise of such care herself, without the slightest evidence that she did anything at all. As a general rule one who has no control or authority over another is not responsible for the negligence of the other, but instructions should be given as an aid to the jury in deciding the case, and in view of the evidence this instruction was wrong."

That case recognized the general rule that a passenger in an automobile, who is in the exercise of proper care, is not responsible for or chargeable with the negligence of the driver over whom he has no con-

trol, but held that a somewhat similar instruction was inconsistent and contradictory because, under the evidence in that case, facts conveying knowledge of the danger were at hand and were as readily available to plaintiff as to the driver. The facts there are not comparable with the facts in this cause, and the reasons advanced for condemning the instruction there are neither applicable nor controlling here. Certainly no duty devolved upon plaintiff to warn the driver of a danger of which she had no knowledge nor of which in the exercise of due care she could have learned in time to warn him to avoid it.

We think plaintiff's instruction No. 6 contained a correct statement of law applicable to the facts of this case. Under the facts in the record it was clearly a question of fact for the jury to determine whether or not both plaintiff and the driver of the car were exercising due care at and prior to the accident. If the driver of the car was exercising due care, and there was ample evidence to justify the jury in so finding, then undoubtedly it would be a fair inference that plaintiff as a passenger in the rear seat was in the exercise of due care. (*St. Clair Nat. Bank of Belleville v. Monaghan,* 256 Ill. App. 471.) There is no evidence that even tends to show that the driver of the automobile was not in the exercise of reasonable care for the safety of himself and his passengers.

Defendant also complains of instruction No. 19 given at plaintiff's request. We find no error in this instruction. An instruction of similar import was given in *Chicago City Ry. Co. v. Anderson,* 182 Ill. 298, where the court, answering the criticism of it, said at page 300:

"Objection is made to appellee's instruction numbered 14, because thereby the jury were told that in estimating her damages they might, in connection with her personal injuries, take into consideration her pain

and suffering, if any are proven, undergone by her in consequence of her injuries, if any are proved; and the criticism indulged in is, that thereby the jury were permitted to allow damages for any mental pain and suffering suffered by her. The mental pain that comes from the contemplation of a maimed body, and the humiliation of going through life in a crippled condition, is too remote to be considered an element of damage. The mental pain that may be considered and allowed for in this class of cases is such as is the direct result or concomitant of the physical pain suffered. Mental pain is always an attendant upon severe physical pain,—such is the relation of mind and body,—and the mental pain that is the direct and necessary result of the physical pain, but not otherwise, is a proper element of damages in personal injury cases. (*Chicago City Railway Co. v. Canevin,* 72 Ill. App. 81.) The instruction violated no rule of law regarding the element of pain, either mental or physical, suffered by an injured person.''

It is contended that the amount of the verdict, $50,000, is excessive. Plaintiff, 22 years old and in good health, was four months pregnant at the time of the accident. When removed to the hospital she was unconscious and in a state of profound shock; she had a compound fracture of the left femur and a simple fracture of the right femur and of the left fibula; the left side of her skull was fractured just above the temporal bone, and she had received crushing fractures of the left sacro-iliac synchrondosis and of the symphysis pubis; there was a large piece of her scalp, about two inches square, missing entirely, and what remained of it was torn from her head almost from ear to ear; five of her upper and three of her lower front teeth were knocked out; and she was vomiting and had lost considerable blood  For several weeks she was rational at times and unconscious at other

times. Stimulants and narcotics were administered to her for over a period of several months to relieve her intense pain. Her wounds became infected and foul-smelling. Gangrene developed in the compound fracture of her left leg. No X-rays could be taken when she was first taken to the hospital because she could not be moved. On the third day she was placed in a body cast. For three months she was unable to perform her bodily functions and was given enemas and catheterized. The broken ends of her femurs overlapped, resulting in the shortening of her legs, but conditions were such that nothing could be done to correct the shortening for two months. During that period plaintiff was in two successive body casts and Thomas splints were applied. After about two months Stineman pins were put through both of her heels while she was under an anaesthetic. Weights were suspended from her legs to get and keep the bones in apposition, remaining on one leg five and on the other six months, and she was unable to move when her baby was delivered by the Caesarean operation. An obstinate infection of the wounds prevented normal healing and necessitated frequent operations to remove pieces of bone and to permit the escape of pus. A bony union was finally established in her right leg, but in her left femur, where the infection persisted, there was only a soft callus formation. The muscles at the site of the fracture of the left femur had all united with and grown into the callus on account of the infection and swelling. She was taken home from the hospital June 16, 1932, 16 months after the accident. At the time of the trial, 20 months after the accident, an X-ray examination revealed incomplete repair of her fractured pelvis. The left femur showed about 25 degrees angulation with about two inches gone from the broken ends of the bone, due to pieces of the bone "sluffing" off. A soft callus formation like the

"handle of a teapot" connected the broken ends of the bone. There was some overriding and deformity of the fibula of the left leg. This leg was crooked from knee to ankle. Her left knee and left hip were stiff at the time of the trial from prolonged immobilization, which condition "would require many years to correct, if it could be corrected at all." At the time of the trial she was unable to stand or walk without assistance, and with the aid of crutches she could take but a few steps. She wore a leather brace over the fractured left femur. It is impossible for her at any time in the future to give normal birth to a child. Her attending physician was of the opinion that by operating and rebreaking her left leg he might improve its condition. Another doctor was of the opinion that the chances were all against improvement by such an operation and advised against it. At the time of the trial plaintiff was suffering from headaches and dizzy spells in addition to the pain experienced from her numerous fractures, and she was in a delicate, weak and anemic condition. It was testified that her condition at the time of the trial was permanent. Prior to the accident she had earned $14.85 a week in one position and $17 in another. Her earning power was totally and permanently destroyed. Her hospital bill was $4,806.05, her doctors' bill $2,500, and her nurses' bill $2,600.

Considering the nature of plaintiff's injuries, the permanency of her crippled and practically helpless condition, the pain she suffered and is destined to suffer, her loss of earning power, her inability to bear children naturally, the fact that she will be deprived of the privileges and enjoyments common to people of her class, and her hospital, doctors' and nurses' bill aggregating about $10,000, we do not think the amount awarded is excessive.

There was ample evidence to justify the jury in finding that defendant's negligence was the sole, proximate cause of the accident, and, as there were no prejudicial errors upon the trial, the judgment is affirmed.

*Affirmed.*

FRIEND, P. J., and SCANLAN, J., concur.