(Nos. 5085-5089, Consolidated—

WILLIAM TYLER, an emancipated male of the age of nineteen years, and WILLIAM TYLER, a minor, by ANDREW SMITH, his Father and Next Friend; JOHN T. WHITE; IRENE JACOBS; CHERYL JOHNSON, a minor, by IRENE JACOBS, her Mother and Next Friend; ANDREW J. SMITH, Administrator of the Estate of L. C. TYLER, Deceased; Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed November 12, 1968.*

R. W. HARRIS and WHAM AND WHAM, Attorneys for Claimants.

WILLIAM G. CLARK, Attorney General; C. ARTHUR NEBEL and LEE D. MARTIN, Assistant Attorneys General, for Respondent.

PERLIN, C.J.

Five claimants seek recovery of money damages arising out of an automobile accident on December 3, 1961. They allege that respondent was negligent in the maintenance of a public highway, and failed properly to warn the traveling public of a rock wall at the end of a "T" intersection of Routes Nos. 37 and 57 in Williamson County, Illinois, a few miles south of Marion, Illinois.

Claimants, William Tyler, John T. White, Irene Jacobs, and Cheryl Johnson, sustained personal injuries, and L. C. Tyler, the wife of William Tyler, was killed while riding in an automobile driven by John T. White. They had been traveling in a southerly direction along Route No. 37 at approximately 6:00 A.M. in foggy weather, when the car crashed into a rock wall.

The complaints in the consolidated cases charge that during the year of 1960 a new highway, designated Interstate Route No. 57, was constructed, which ran generally parallel and to the west of State Route No. 37 in Williamson County. At a point about eight miles south of

Marion, Illinois, an access highway to Interstate Route No. 57 was constructed, which ran in a southeasterly direction connecting State Route No. 37 and Interstate Route No. 57. After the construction of the access road the course of Route No. 37 was changed so that it intersected the access route at a right angle, or in a "T" intersection.

The new portion of State Route No. 37 and the access road at the "T" intersection were cut through a hill. The complaints charge this left high banks on either side, and a bank of solid rock at the end of the "T" intersection directly facing the southbound traffic on State Route No. 37. As a result of the new construction, according to claimants, State Route No. 37 was changed to make a sharp turn to the right a short distance before it came to the dead end bank of solid rock.

Claimants contend that, on December 3, 1961 at approximately 6:30 A.M. and before daylight, John T. White was driving his 1959 Ford vehicle in a southerly direction along State Route No. 37 at a reasonable rate of speed unknowingly approaching the "T" intersection, and that by reason of the sharp turn, lack of proper warning devices, fog, and nearness of the dead end intersection, he was unable to stop prior to crashing into the rock wall at the "T" intersection.

Claimants further contend that prior to this collision respondent had had actual notice of the hazardous condition created by the construction and maintenance of the highway without adequate warning devices by reason of occurrence of at least 35 accidents from the date the highway opened for public use in November, 1960 until the date of the accident involved in the instant case. The previous accidents at this location resulted

in injury to numerous persons and property, and the death of three other persons, according to claimants.

Specific acts of negligence alleged are that respondent failed to give sufficient warning of the sharp right turn, and the fact that the road came to a dead end only 300 feet beyond said curve; that it permitted said curve and dead end road to exist and remain in such condition when it knew of the many accidents causing injury and death to the users prior to December 3, 1961; that it failed to establish and maintain adequate and proper warning signs or devices at a sufficient distance north of the sharp curve and dead end intersection to provide advance warning to southbound traffic of its approach; that it negligently and carelessly constructed said highway and the Route No. 57 approach when it knew, or should have known in the exercise of ordinary care, that the highway, as constructed, created an undue hazard for the traffic, which had to use it.

The damages sought are as follows: Case No. 5085, William Tyler, for personal injuries, loss of earnings and medical expenses, $20,000.00; Case No. 5086, John T. White, for personal injuries, medical expenses and loss of earnings, $10,000.00; Case No. 5087, Irene Jacobs, personal injuries and medical expenses, $20,000.00; Case No. 5088, Cheryl Johnson, a Minor, by Irene Jacobs her Mother and Next Friend, personal injuries and medical expenses, $20,000.00; and, Case No. 5089, Andrew J. Smith, Administrator of the Estate of L. C. Tyler, deceased, and for wrongful death on behalf of her husband and minor daughter, $25,000.00.

In order to recover, each claimant must prove by a preponderance of the evidence (1) his or her freedom from constributory negligence; (2) the negligence of

respondent; and, (3) that respondent's negligence was the proximate cause of the injuries claimed herein.

The evidence established that the "T" intersection was backed by a rock wall, approximately 10 to 15 feet high, which faced traffic traveling southbound on Route No. 37. The wall was located approximately 21 feet from the edge of the pavement. At the approach to the intersection was a "Stop Ahead" sign with "1,000 feet" beneath it, a flashing yellow light mounted on top of another "Stop Ahead" sign on the left side of the road, a "37" sign backed by a directional arrow, and "Stop" signs on each side of the road at the intersection itself, all controlling southbound traffic. Immediately in front of the rock wall was a guard rail, and a rectangular sign with directional arrow and the number "37" on a backing of black and white stripes. An overhead red signal, which was supposed to flash at the interesction for southbound traffic, was also installed.

The driver of the car, John T. White, testified that he was enroute from Benton Harbor, Michigan to Arkansas. He had been over Route No. 37 about a year before the accident, but the intersection had not been in existence at that time. The weather was foggy and wet. He was driving at a speed of 40 or 45 miles per hour. His headlights were on dim, White stated, because that way the light was on the ground. When they were on bright, according to White, he could not see because of the fog. As he approached the scene of the accident, he saw no signs, but did see a blinking yellow light as he started around the curve. He stated that he expected to find a crossroad. When he saw the blinking light he slowed down, but he saw nothing as he rounded the curve, and went back to his normal speed. Suddenly he saw

the embankment across the road, but could not stop. He applied his brakes, and skidded into the wall. He was able to get help at a nearby house, and returned to the scene of the accident. White testified that at no time did he see a red light flashing overhead.

William Tyler testified that he was riding in the rear seat of the car with his wife, L.C., and daughter, 18 months old. Because of the waist-high fog he saw no signs until they reached the sign, which said "37", after the brakes were applied. The fog was not thick close to the pavement, and they could see the road.

The other two passengers, Irene Jacobs and her daughter, were riding in the front seat.

Larry Marvin Kimmel, a farmer who lived near the intersection, testified that one of the occupants of the car called at his house for help immediately after the accident. He went to the car, and described the scene as right after daylight and foggy. He did not remember whether the red light was flashing. He estimated that about 39 to 40 cars had driven into the wall since the opening of the intersection in November, 1960. According to Kimmel, the curve leading to the intersection is gradual, but it still "comes up on you awful fast." He further testified that, since the installation of rumble strips (corrugated gravel in the road) subsequent to the accident in the instant case, there have been no more similar accidents. The strips were placed about 1,000 feet from the stop sign.

William Carlton, Jr., a Marion city policeman, testified that he went to the scene of the accident just as the last ambulance was leaving, and noticed that the red flasher light at the intersection was not operating. He

recalled making a statement to a boy standing there that "It is a damn shame this light isn't working. This might have been avoided." He described the light as red facing the southbound traffic, and amber in the other two directions. None of the lights were working.

James Wilson, who operated a Funeral Home in Marion, testified that his ambulance picked up the occupants of the car in the instant case, and later prepared L. C. Tyler's body for burial in Arkansas. He further testified that his funeral home had been called to prior collisions on several occasions where drivers had gone into the rock wall.

The evidence further revealed that three deaths had occurred at the intersection prior to the accident in the instant case, one in February, 1961, and two on July 21, 1961. Although evidence of prior accidents is not competent to show negligence, it is admissible to establish that respondent had actual or constructive notice of the dangerous conditions, which existed. (*Budek* vs. *Chicago*, 279 Ill. App. 410; *Sheppard* vs. *City of Aurora*, 5 Ill. App. 2d 12; *Wells* vs. *Kenilworth*, 228 Ill. App. 332.)

Testimony concerning the inquest into the accident on July 21, 1961 revealed that the red light was not flashing at the intersection when that accident occurred, yet started working as an operator of a wrecker, Robert J. Parks, was retrieving the car. At that time witnesses called the attention of the State Patrolman to the fact that the light was not working. Parks and his companion, O. L. Norris, testified that the light flashed for about 20 to 25 minutes, but, as they left, they noticed it had stopped working again. Witnesses Park, Norris, and State Trooper Gardner also testified at the July inquest that the light was not working at the time of the accident.

Williamson County Coroner, Paul Litton, stated that on July 25, 1961 he conducted an inquest on the bodies of the two people killed in the accident on said date. The verdict of the Coroner's Jury admitted in evidence reads as follows:

"In the matter of the Inquisition of the body of W. J. Pryor and Nora Kemp, deceased, held at Marion, Illinois on the 25th day of July, 1961.

We the undersigned jurors sworn to inquire into the deaths of W. J. Pryor and Nora Kemp, on oath do find that they came to their death by injuries received in an automobile wreck at the intersection of State Routes Nos. 37 and 57. *The jury recommends that the proper authorities check the lighting system to see that it is in working order, and that this hazard be eliminated immediately.*" (Emphasis supplied.)

The Coroner then notified Paul Powell, Speaker of the Illinois House of Representatives of the verdict. Speaker Powell then sent a letter, dated October 31, 1961, to Mr. Ralph Bartlesmeyer, Chief Highway Engineer of the Division of Highways, which stated:

"Dear Ralph:

I am enclosing a copy of a Coroner's Inquest mailed to me by Paul C. Litton, Coroner of Williamson County. You will note that W. J. Pryor and Nora Kemp came to their death by injuries received in an automobile wreck at the intersection of State Routes Nos. 37 and 57. I am sure you will not want this to happen again, and will check the lighting system, if this has not already been done.

Sincerely yours,
Paul Powell"

A letter, dated November 9, 1961, addressed to Paul Powell, states as follows:

"My dear Mr. Speaker:

This will acknowledge receipt of your letter of October 31 to which was attached a copy of Williamson County Coroner Paul C. Litton's report on a fatal accident, which occurred at the intersection of Illinois Route No. 37 with Interstate Route No. 57 on July 21.

A complete investigation was made at this location by representatives of our Carbondale District Highway Office. They have informed me that, to the best of their knowledge, the overhead flashing signal

was in operation at the time of the accident. They have based this statement on a report made by a State Trooper who investigated the accident in which he indicated that the red flashing light was operating, and that the unit on Route No. 37 drove past the stop signs and flashing red signal, striking a rock embankment with the front end of his vehicle. My report states that representatives of our Carbondale District are constantly on the alert checking traffic control devices. The District Office and State Highway Police are immediately notified when either a stop sign or other control is knocked down, or a traffic signal is out of operation, and replacements are made at once.

I wish to thank you for calling this situation to my attention.

Very truly yours,
R. R. Bartelsmeyer
Chief Highway Engineer"

Mr. Vernon Kupel, Engineer in charge of traffic operations for the district where the accident occurred, testified that he had received a copy of the letter from Paul Powell to Mr. Bartelsmeyer, and made an investigation. His investigation consisted solely of looking at the police accident report of the July 21st accident. The policeman's statement in the report noted: "Unit 1 drove past stop signs and flashing red signal, and struck rock embankment with right front end." The State Trooper who wrote the report was not called to testify in the instant case.

Kupel further testified that, prior to the accident in the instant case, his division was concerned with accidents involving vehicles going into the wall, and that they had given consideration to additional warning devices at the intersection approach. He stated that his department had received complaints by persons concerning the frequency of accidents at that location, and that he had reports of nine accidents involving running into the wall or the ditch in his files from the State Highway Police.

According to Kupel, before construction of this in-

tersection, Route No. 37 extended straight south where it would have intersected with Route No. 57 in the form of a ''Y''. He testified that the Manual of Uniform Traffic Control Devices for Streets and Highways, published by the Department of Public Works and Buildings, Division of Highways, and placed in the hands of the Districts for use in erecting signs, did not call for the use of a ''T'' road intersection sign. He stated that they were bound to follow the manual for all general instances, but that signs have been designed to meet special conditions with the approval of the Springfield office. At the intersection in question, according to Kupel, they considered only standard signs. His testimony established that pavement markings would have been permissible.

Keith Mahan, Engineering Technician for the Division of Highways, testified that in August, 1961 he was sent by Mr. Kupel to draw a sketch of the signs approaching the intersection. He further testified that the signs approaching the wall were changed after the accident, because they could possibly lose their reflectorization.

Carol Sorgen, who made photographs of the scene of the accident for claimants, testified that, on Decem- 5, 1961, two days after the accident, he took pictures of the scene, and did not think that the ''Stop Ahead'' signs were reflectorized. Sorgen also noticed that the ''Stop Ahead'' signs had ''10/58'' on them, which he thought were dates. The numbers were never explained by respondent.

Louis Von Behren, Traffic Field Engineer for the Division of Highways, testified that no individual was responsible for the operation of the red light flashing

signal, but that all of the technical employees were collectively responsible. He further stated that he was once called when the overhead light was out, and went to fix it. It had needed a new bulb. According to Von Behren, the Department requires reflectorization of all "Stop Ahead" signs, but that reflectorization deteriorates over a period of time. He remembers discussing the fact that "35 accidents" had occurred at the wall, although he did not think there was evidence of that many. He also stated that, since the installation of rumble strips, they have noticed a decrease in accidents.

Assistant District Engineer, Thomas O. Cromeenes, stated that the location in question was the only place in the District, which had a rock wall at the end of a "T" intersection.

Jessie W. Childers, Group Superintendent of the Central Illinois Public Service Company, testified that his company furnished electricity to the State of Illinois for the red flasher signal. He further stated that an examination of his records on December 3, 1961 showed no interruption of service. There was no record of interruption of operation of electrical energy during July 20, 21 and 22, 1961. Respondent failed to offer any testimony as to whether or not the light was in fact working at the time of either the accident in question or the one in July. It was not established that the sole criterion of whether the light was operating was one of electrical energy. In fact, respondent's own witness testified that on one occasion the bulb was burned out. There was no rebuttal to claimants' witnesses who testified that the light was not working.

Respondent cites the case of *Shirar, Admr., Etc.* vs. *State of Illinois,* Case No. 5124, to the effect that a

red light was not required by statute at the intersection. The question is not whether a specific sign is required, but whether respondent exercised reasonable care in warning the public of the danger on the highway. It is the conclusion of the Court that reasonable care was not exercised in this instance.

The evidence adduced is, in the Court's opinion, insufficient to rebut the direct testimony establishing the fact that the overhanging red light was not, in fact, operating at the time of the accident, and that it had had a history of sporadic inoperation.

Respondent contends that the sole proximate cause of the accident was that the driver proceeded past six signs warning him of his duty to stop at the intersection, and that his failure to heed the signs caused the accident and resulting injuries to himself and his passengers.

The State of Illinois owes a duty to the traveling public to maintain adequate and proper warning signs or devices alerting the public to the unusual and dangerous conditions ahead. (*Mammen* vs. *State of Illinois,* 23 C.C.R. 130; *Bovey* vs. *State of Illinois,* 22 C.C.R. 95). There is no question but that respondent had ample notice that the signs, which were posted, were woefully inadequate in apprising the motoring public that a "T" intersection, backed by a lethal 10 foot high rock wall, stood beyond the curve, which was marked only by "Stop Ahead" and the usual curve signs. Although claimant's photographer testified that the "Stop Ahead" signs were not reflectorized two days after the accident, respondent never established that the signs were, in fact, adequately reflectorized to be visible to the motorist traving in darkness or fog. In fact, respondent's witnesses testified that signs do tend to lose their reflectorization

after a period of time, and that from all indications these signs might have been standing since October, 1958.

In *Mammen* vs. *State of Illinois*, 23 C.C.R. 130, recovery was granted because the State did not give adequate warning of a discontinued roadway. The Court stated at page 135:

"From all the evidence in this case, we find that respondent was negligent in failing to properly inform the motoring public of the barricade's existence and the dead end of the road. Regardless of whether Mr. Mammen saw the 'No Outlet' sign or whether he did not, that sign was clearly inadequate as a warning that he would be confronted with a low barricade, which blended into the landscape, and could not be readily seen in time to avoid colliding with it. The evidence clearly reflects that no warning of any kind was given by respondent as to the existence of this barricade.

"This situation comes within the purview of *Bovey* vs. *State of Illinois*, 22 C.C.R. 95, wherein we allowed a recovery based upon the insufficiency of the signs to warn the motoring public of a particularly dangerous condition. The rule there announced is that, although the State is not an insurer of the safety of persons in the lawful use of its highways, it is nevertheless under a duty to give warning by the erection of proper and adequate signs at a reasonable distance of a dangerous condition of which the State had notice either actual or constructive. We hold that, under the conditions involved in this case, a sign stating "No Outlet" is wholly insufficient to advise the motoring public of the barricade involved and the abrupt ending of a State highway. Respondent was negligent in failing to maintain adequate signs warning of this particular danger, which obviously was known by it to exist long prior to the happening of this occurrence."

In the instant case, it was established that there were no signs to warn the motorist of the particular danger of the rock wall. The only sign, which might have warned a motorist traveling in darkness or heavy fog that he must stop, a flashing red light, was not in operation at the time of the accident. The failure of the red light to operate at all times had been forcefully brought to the attention of respondent's agents as early as July, 1961, over four months before the accident in question, yet no action was taken by respondent. Even

personal intervention of the Speaker of the Illinois House of Representatives requesting a check of the lighting system and a specific recommendation by a Coroner's Jury to this effect brought no reasonable attempt to remedy the undisputed fact of the erratic operations of the flashing red light. Not one investigator was dispatched to examine the light. Not one employee was specifically assigned to keep the light in operation, and, after ''35 accidents and three deaths'' in less than a year, not one step was taken to change the obviously inadequate warning system, or the obviously dangerous rock wall intersection. Reasonable care was in no way exercised by respondent.

Although the rumble strips, which have now decreased the accident rate at the intersection, may not have been available, there were many alternative precautions such as flares, operating red lights, luminous pavement markings, and warnings of the specific danger, which should have been utilized as a result of respondent's actual notice of the dangerous trap it had created.

It is the conclusion of the Court that claimant, John T. White, has not adequately proved his freedom from contributory negligence in that the speed of 40 to 45 miles per hour under the visibility conditions described by the witnesses herein would appear excessive. Although he expected to find a crossroad after seeing the yellow light, he did not decrease his speed for any appreciable time. This fact, however, does not detract from respondent's negligence, which also contributed to the accident. Therefore, recovery by the innocent injured passengers shall be allowed. (*Hargrave* vs. *State of Illinois,* Case No. 4992). In such a situation, liability

is joint and several, and recovery may be had against either negligent party.

L. C. Tyler, 23 years old, died from injuries suffered in the accident 37 hours after she was admitted at the Marion Memorial Hospital. She was pregnant at the time. Her surviving husband, William Tyler, was 18 years old at the time of the accident, and her daughter, Sandra Marie Tyler, was 18 months old. L. C. Tyler did not work for wages, but kept house for her husband and child. Claimant for the benefit of the survivors of L. C. Tyler is Andrew J. Smith, the Administrator of her Estate. Since substantial damages must be presumed where the surviving spouse and lineal kindred survive, Andrew J. Smith, as Administrator of the Estate of L. C. Tyler is awarded the sum of $20,000.00.

Claimant, Irene Jacobs, suffered a fracture of the acetabulum without displacement, and the latest x-ray showed a complete healing of this fracture with full normal range of motion. She had aching in the hip after walking four or five blocks. She also suffered a fracture of the left forearm involving both bones with displacement, and open reduction had to be performed. An intramedullary nail was passed through the ulna and a radius plate was used for fixation. The fixation devices were removed, and x-rays taken in September, 1963 showed good alignment. Her doctor concluded that there was full range of motion with no muscle atrophy in both the wrist and arm. She also suffered a laceration resulting in a disfiguring scar running across both eyelids and over the bridge of her nose, described as "moderately severe" by the doctor. She had a fractured rib, which caused her difficulty in breathing during treatment. There is no question but that she had extensive pain and suffering while recovering from the

injuries, that she had to use crutches, that she was bedfast in the hospital for three weeks and at home for a month and a half, and that her residual permanent condition consists of the disfiguring scar and pain after walking a long distance. The sum of $7,000.00 is hereby awarded to Irene Jacobs.

Claimant, Cheryl Johnson, 18 months old at the time of the accident, had a dislocation fracture of her left ankle from which she fully recovered. She was in a cast, and also had lacerations, which resulted in disfiguring scars still visible in September, 1963. There was a scar on the upper lip near the angle of the mouth, one-half inch long extending diagonally toward the cheek. Cheryl Johnson is hereby awarded $3,300.00.

Claimant, William Tyler, had a skull fracture and swelling over the right eye, although he was conscious when first seen by the doctor. There was no injury to the brain. There was a fracture to the ends of the radius and ulna. It was reduced, and a plaster cast applied. In September, 1963, he had a 15° limitation of flexion in his wrist, and a small amount of loss of rotation of the forearm. The pronation, which is with the palm down, was diminished by 15°, and the supination, which is with the palm up, was diminished by about 30°. The doctor described these injuries as permanent. William Tyler is hereby awarded the sum of $7,000.00.