(No. 76-CC-0581—)

JAMES JOHNSTON and RITA JOHNSTON, Claimants, *v.* The STATE OF ILLINOIS, Department of Public Works and Buildings, Division of Highways, Respondent.

*Opinion filed June 29, 1979—Rehearing denied September 21, 1979.*

RONALD S. FISHMAN, for Claimants.

WILLIAM J. SCOTT, Attorney General (RICHARD GROSSMAN, Assistant Attorney General, of counsel), for Respondent.

HOLDERMAN, J.

This action arises out of a one-car accident which took place on January 19, 1975 at approximately 10:30 to 11:00 p.m. on Higgins Road, also known as Illinois Route 72, at a point where Higgins crosses Interstate 90, also known as Northwest Tollway. The highway is four lanes but only two lanes on the bridge crossing I-90 and is a construction area.

Mr. Johnston, the driver of the car, and his wife, Rita Johnston, were the only passengers in the car. They had been out for the evening and were on their way home when the accident occurred.

Higgins Road, a four lane divided highway, contains two lanes running in a southeasterly direction and two

lanes in a northwesterly direction, separated by a twenty-five foot grassy median strip.

Construction changing Higgins from a two lane into a four lane divided facility, from Illinois Route 58 to Illinois Route 59, began on October 30, 1970, and was completed on November 6, 1972 and accepted by the Illinois Department of Highways on April 22, 1973. However, the two lane bridge on Higgins which crossed over I-90 remained unchanged. This presented an obvious traffic problem since the existing two lane bridge was directly in line with the two northwesterly lanes, there being no bridge at all directly in line with the two southeasterly lanes.

In order to cure this obvious traffic defect, the Highway Department constructed a temporary roadway across the median strip immediately north of I-90 thereby requiring vehicles traveling in a southeasterly direction to first enter their left lane, make an extremely sharp left turn in order to cross over the median strip, and then enter the opposite two traffic lanes. The vehicles then have to proceed across the bridge and then again cross over the median strip in order to reenter the lanes ordinarily used for southeasterly traffic.

It is admitted that this is a rural area and that there was no artificial lighting or illuminated warning devices in the area of this construction zone. Since this occurrence took place at 10:30 p.m., the area was pitch dark. At the time, the pavement was dry. There were snow flurries, thereby further obscuring the driver's vision.

Claimant, James Johnston, age 65, residing at 3611 Hillside Road in Evanston for 18 years, retired from International Harvester for four years, testified that after retirement he worked as a clerk in a liquor store at 9961

Gross Point Road in Skokie as a general manager, earning, about $200.00 per week. On January 19, 1975, at approximately 10:30 p.m., he and his wife were on their way home from a Howard Johnson Inn in Elgin. This was the first time he had ever used this particular highway. He was driving a 1969 Mercury in a south-easterly direction on Higgins and had travelled about six miles on Higgins. Southeast traffic was extremely light, there being no other vehicles travelling in his direction.

He testified that as he proceeded in the righthand lane at about 40 to 45 miles per hour, he saw some road construction signs that stated "Construction Ahead." As he proceeded further, he passed several other road construction signs and then saw a row of painted barrels with arrows on them indicating "Keep Left" and so he moved his vehicle from the right lane into the left lane. There were no flashing lights or other illuminated warning devices on the barrels other than the signs that stated "Keep Left." As he passed by the barrels, there was a truck coming in the opposite direction so he dimmed his headlights. Shortly thereafter, with the barrels to his right the roadway in front of him suddenly ended. He struck a guardrail which was directly in front of him. There were no warning signs indicating that his lane of traffic was about to end or that he was supposed to make a sharp turn to the left in order to go across the median strip into the opposite lane of traffic. He stated:

"The arrows to me as I approached the barrels indicated I was in the right lane. The barrels started at the shoulder up to the center with arrows points which I moved according to the arrows to the left lane and I proceeded for a fair distance with the arrows, which to me told me I was belonging in that lane, because the signs had told me that the right lane was ending and arrows pointed to where I should go and I went to the left lane."

Claimant contends that he never hit any of the barrels and that the signs on the barrels simply said for

his vehicle to "Keep Left" which instructed him to keep out of the right lane, and to stay to the left of the barrels. When he spotted the guardrail, it was too late.

The impact rendered him semi-conscious. His wife, in the right front, was rendered unconscious. They had to wait, trapped in the vehicle, until they were rescued by a passing motorist, and they were rushed to the Northwest Hospital where he remained for two weeks. He noticed he was bleeding from his nose and felt a burning sensation in his chest. His back was broken, requiring him to wear a steel corset. His sternum was cracked. While in the hospital, he couldn't move because he was extremely' miserable and in considerable and intense pain.

After returning home from the hospital, claimant, James Johnston, was required to remain in bed for another four to six weeks and was out of work for approximately two months. Upon returning to work, he was able to perform only part of his tasks and was required to work on a part-time basis. Because of his injury, he was required to wear a back brace for six months, and during that period time, he experienced low back pain which hurt him most around the waist.

Claimant testified he still has sharp pains in his back, particularly when he twists or moves.

Claimant, Rita Johnston, testified:

"All of a sudden, we ran out of road. There was—a guardrail appeared in front of me about a car's length ahead, maybe a car and a half ahead, and we hit.

I hit the dashboard and blacked out. And that's my recollection."

The area was pitch dark. There were no flashing yellow lights or any other lights in the area.

Claimant, Rita Johnston, experienced very severe pains in her back and legs and remained pinned in the

vehicle until she was removed and taken to Northwest Hospital. She remained in the hospital from January 10 to February 4, 1975, being treated by orthopedic surgeons and associates. Because she had sustained severe abdominal injuries, she was also treated by another doctor for that condition.

She testified that while she was in the hospital, the pain was very severe and was given pain killers every four hours, was not allowed to move, and was unable to feed herself. Because of the fractured vertebrae in her lower back, she was not permitted to use her hands and had to lay perfectly still. She wore a steel corset for approximately nine months. During that period of time, there was considerable pain in her back which radiated down into her legs, and into her toes.

She was prescribed leg exercises for her deteriorating muscles which had lost considerable strength. She was also treated by an osteopath who gave her some relief from the pain she was suffering.

Because she had to be in a walker after returning home from the hospital, it was necessary for her to hire a housekeeper to take care of her home.

After the steel corset was removed, she was required to wear a rib belt which she still wears occasionally when her back hurts or she gets tired. For a long period of time, she took weekly massages and was required to swim every day. She has to avoid climbing stairs and cannot lift heavy objects.

Mrs. Johnston's hospital bill was $2,015.35; emergency care, $16.00; Dr. Lidge, $286.00; Dr. Kennedy, $117.00; Dr. Robbins, $42.00; Dr. Nafelski, $300.00; Dr. Mauer, $117.50; x-ray bill, $25.00; additional household help, $260.00; making her total bills $3,278.85.

Mr. Johnson's medical bills were in the amount of $2,701.00 and his loss time from work was $1,600.00.

He sustained a severe compression fracture to the lumbar spine, fractured ribs and other internal injuries.

The present case is greatly similar to the case of *Tyler v. State of Illinois*, 26 Ill. Ct. Cl. 231. In that case, the Court laid down the rule that the State of Illinois "has a duty to the traveling public to maintain adequate and proper warning signs or devices alerting the public to unusual and dangerous conditions ahead".

The Court points out that in the present case there were no lights of any kind or character in operation at the place where the accident occurred even though a hazardous condition existed.

In the case of *Perkins v. State of Illinois*, 26 Ill. Ct. Cl. 222, the question was whether or not there was proper or sufficient warning of the presence of barricades to the traveling public. In that case, it appeared the State had erected barricades, signs, and flashing signals to properly advise.the traveling public. The evidence was clear that at the time of the crash the lights and warning signals were in operation and the Court properly held that the State had fulfilled its duty to the traveling public.

In the present case, there was a complete absence of lights, either overhead or warning lights, and the traveling public was not, in the opinion of this Court, adequately warned of the existing situation. It is clear from the evidence that the respondent did not adequately protect the public and that claimants were not guilty of contributory negligence.

IT IS HEREBY ORDERED:

That claimant, James Johnston, be awarded the amount of FIFTEEN THOUSAND ($15,000.00) DOL-

LARS, and claimant, RITA JOHNSTON, be awarded the amount of TWENTY THOUSAND ($20,000.00) DOLLARS.